UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
OSCAR MOTA,

                    Plaintiff,

          - against -

IMPERIAL PARKING SYSTEMS, et al.,

                    Defendants.

----------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8|24|10

**OPINION AND ORDER**
08 Civ. 9526

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

          Plaintiff   Oscar   Mota   brings   this   suit   seeking   unpaid
overtime  wages  under  the  Fair  Labor  Standards  Act  ("FLSA")  and
the  New  York  Labor  Laws.   He  also  seeks  to  recover  for  an
alleged  failure  to  pay  him  a  commission  pursuant  to  an  agreement
allegedly  memorialized  in  a  letter  from  defendant  William  Lerner
dated  March  1,  2004.   Defendants  include  Imperial  Parking
Systems,  Inc.  ("Imperial")  and  24  individual  garages,  as  well  as
William  Lerner,  Jack  Lerner,  and  Robert  DeLuise  as  individuals.
Defendants  dispute  Mota's  overtime  claim  on  the  grounds  that  he
was,  during  the  relevant  periods,  an  exempt  employee  under  the
FLSA  and  thus  not  eligible  for  overtime  payment.   Further,
defendants  maintain  that  the  document  alleged  as  the  basis  of
the  commission  agreement  is  a  forgery  and  therefore  is  not  a
binding  agreement.

1

A bench trial was held in this action on June 21 and 22, 2010. Due to the unavailability of one of defendants' witnesses, trial was adjourned until July 15, 2010, when closing arguments were held.[1] The following Opinion constitutes our findings of fact and conclusions of law. As discussed below, we find for the defendants on all counts.

BACKGROUND

## I. Parties

Plaintiff Oscar Mota was employed by defendant Imperial from the end of May 2003 through August 2007. Imperial is the operator of approximately 90-100 parking garages in New York and New Jersey, employing approximately 600 individuals as parking garage attendants, managers, maintenance staff, and supervisors. Trial Transcript vol. 2 ("TT2"), 269:2, June 22, 2010; TT2 320:6; TT2 339:16-17. Defendants Jack and William Lerner are the owners of Imperial. Jack Lerner founded the company and his son, William, is now the President of the corporation.

---

[1] Both sides submitted direct testimony by affidavit and presented their witnesses for cross examination at trial. Plaintiff's witnesses included plaintiff Oscar Mota and Imperial employees Lenny Almonte and Angel Orta. Plaintiff submitted direct testimony for two other employees, but did not call them to the stand for cross-examination. That testimony will therefore be disregarded. Defendants' witnesses included defendants William Lerner and Robert DeLuise, as well as Imperial employees Betty Rotoli and Alex Etienne. Defendant also submitted direct testimony from Imperial employee Saul Arichavala, but that testimony was withdrawn due to Arichavala's inability to appear at trial.

Defendant Robert DeLuise was the General Manager at Imperial during Mota's employment and has since retired.

## II. Claims

Plaintiff's complaint includes twelve claims against defendants. First, plaintiff seeks unpaid overtime wages under the FLSA. Second, plaintiff brings a similar claim under the New York Labor Laws. Plaintiff's third claim, for a spread of hours violation, was withdrawn. Fourth and fifth, plaintiff claims that Imperial took improper deductions from his wages, in violation of both the FLSA and the New York Labor Laws. Plaintiff's sixth through twelfth claims all stem from the alleged agreement to pay a commission and include: (6) breach of contract based on the March letter; (7) breach of implied contract based on discussions at a meeting where plaintiff alleges he received the March letter, and further a breach of the implied covenant of good faith and fair dealing; (8) recovery in quantum meruit based on defendants' promises to pay under the terms of the March letter; (9) unjust enrichment, as well as detrimental reliance and promissory estoppel; (10) violation of New York Labor Law §§ 191, 193, and 198 for failure to pay earned commissions; (11) fraudulent inducement to contract because defendants "intentionally, knowingly induced plaintiff to agree to contract with Defendants, with terms that

3

defendant[s] never intended to honor," Complaint ¶ 7; and (12) negligent misrepresentation based on the violation of defendants' duty of care in properly representing employment terms and conditions.

Defendants counter that plaintiff's first and second causes of action should be dismissed because Mota was an exempt employee within the meaning of the FLSA and the regulations promulgated pursuant to that statute, as well as under New York law, and is thus not entitled to overtime wages. Further, they argue that there is no evidence to support a finding of any improper deductions from plaintiff's salary, requiring the dismissal of plaintiff's fourth and fifth claims. Finally, defendants urge that plaintiff's sixth through twelfth causes of action for commissions should be dismissed because they are based on a forged document and have no merit.

## DISCUSSION

While the complaint in this action includes twelve causes of action, there are really two fundamental issues in dispute.

First, we must determine whether Mr. Mota should be exempt under the FLSA and the New York Labor Law because he qualifies as an executive or administrative employee.[2] If Mota is properly

---

[2] The parties do not dispute that the New York Labor Law and the FLSA are identical in all material respects for the purposes of the exemption determination here.

4

classified as exempt, he is not entitled to overtime pay, and the defendants are therefore not liable for any unpaid overtime claims or other damages stemming from such a failure to pay. For the reasons set out below, we find that he is exempt, and thus find for defendants on Mota's first and second claims.

Second, the parties contest whether there was a valid contract in place that would entitle the plaintiff to a bonus based on the earnings of the garages assigned to him.  While defendants acknowledge that Lerner made an offer in April 2004 to pay a commission, it is on different terms and pursuant to a different document than that put forth by plaintiff.  At the close of trial, plaintiff refused to acknowledge the April letter's terms, instead relying on the March 2004 letter and its terms.  We find that the signature on the March letter is a forgery, and therefore cannot form the basis of relief on any of plaintiff's claims.  As set out below, plaintiff has not proven any facts necessary to recover on any of his other claims related to the commission payments, and thus we find for defendants and dismiss the complaint in its entirety.

We discuss each of these larger issues seriatim.

## I.  Whether Mota is an exempt employee and thus not entitled to overtime pay

We turn first to the issue of plaintiff's status under the labor laws.  Pursuant to the FLSA, employers must pay an employee at a rate of "not less than one and one-half times the regular rate at which he is employed" for any hours worked in excess of forty hours in a given week.  29 U.S.C. § 207(a). This general rule does not apply, however, to several types of employees, including "administrative" employees and "executive" employees, who are exempt from the overtime requirements.  29 U.S.C. § 213(a)(1); see also Reiseck v. Universal Communications of Miami, Inc., 591 F.3d 101, 105-06 (2d Cir. 2010)(discussing the administrative exemption); Donovan v. Burger King Corp., 675 F.2d 516, 518 (2d Cir. 1982)(discussing the executive exemption).  "It is the employer's burden to demonstrate that it is entitled to a particular exemption," Kahn v. Superior Chicken & Ribs, Inc., 331 F.Supp.2d 115, 117 (E.D.N.Y. 2004) (citing Martin v. Malcolm Pirnie, Inc., 949 F.2d 611, 614 (2d Cir. 1991)), and any exemption is to be "construed narrowly against the employer."  Id. (citing Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960); Martin, 949 F.2d at 614)).

The question of how the plaintiff spent his working time is a question of fact, while the question of whether his particular

activities excluded him from the overtime benefits of the FLSA is a question of law.   Mullins v. City of New York, 523 F.Supp.2d 339, 353 (citing Icicle Seafoods, Inc. v. Worthington, et al., 475 U.S. 709, 714, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986)).   Defendants assert that Mota is exempt under the executive exemption, the administrative exemption, or some combination of those two categories.   See 29 C.F.R. § 541.708 (allowing for combination exemption).   Mota contests this assertion and further argues that even if he is properly classified as an exempt employee, defendants are not entitled to the exemption because of impermissible deductions from his pay that warrant the revocation of any exempt status.

After fully considering all of the pretrial submissions and the testimony at trial, we find that plaintiff was properly classified as an exempt employee and that no improper deductions warranting the revocation of the exemption were in fact taken from his paycheck.   We make this finding based chiefly on evidence from the plaintiff himself, but also include evidence proffered by the defendants in carrying their burden.

## A.   Exemptions

An exempt executive employee:

(1) [is] compensated on a salary basis at a rate of not less than $455 per week...; (2) ... [has] primary duties involving the management of the enterprise in

> which the employee is employed or of a customarily
> recognized department or subdivision thereof; (3) ...
> customarily and regularly directs the work of two or
> more other employees; and (4) ... has the authority to
> hire or fire other employees or whose suggestions and
> recommendations as to the hiring, firing, advancement,
> promotion or any other change of status of other
> employees are given particular weight.

29 C.F.R. § 541.100(a).

Suggestions regarding employment decisions are still deemed to have "particular weight" "even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." 29 C.F.R. § 541.105.

An exempt administrative employee is one who is:

> (1) Compensated on a salary or fee basis at a rate of
> not less than $455 per week...; (2) Whose primary duty
> is the performance of office or non-manual work
> directly related to the management or general business
> operations of the employer or the employer's
> customers; and (3) Whose primary duty includes the
> exercise of discretion and independent judgment with
> respect to matters of significance.

29 C.F.R. § 541.200(a). The exercise of discretion component of this analysis requires that plaintiff be involved in "the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). While duties covered under this exemption must be more than simply clerical, 29 C.F.R. § 541.202(e), the fact that such independent judgment

is reviewable by management or demonstrated in the form of a recommendation to management does not take the employee out of the coverage of the exemption.  29 C.F.R. § 541.202(c).

### B.  Plaintiff Mota is an exempt employee under the FLSA.

We now turn to plaintiff Oscar Mota, and to the application of these classifications to his position at Imperial.  While plaintiff admitted that he was paid a "flat weekly amount," see e.g., Mota Aff. ¶¶ 53, 63-67, and that his compensation was intended to be a salary covering his 60 hours of assigned work, Trial Transcript vol. 1("TT1"), 106:22, June 21, 2010,[3] he presents a characterization of his primary duties that is diametrically opposed to that presented by defendants.

Plaintiff has testified that he was a "checker" with no managerial authority or discretion whatsoever, though over the course of his testimony he discussed many instances of acting with authority he claimed not to have possessed.  Defendants have offered testimony that Mota was a supervisor tasked with the same management authority as the two other supervisors employed by Imperial at the time: Alex Etienne and Anthony Marzouka.  This authority, defendants maintain, included the ability to hire and fire workers and to otherwise manage their

---

[3] See also TT1 173:4-10 (plaintiff's testimony that he didn't ask for time and a half for working more than 40 hours "because they have me for 60 hours on salary rate").

assigned garages and influence company policy.  The description provided by defendants would certainly result in Mota's classification as an exempt employee, but we also find that based on Mota's testimony alone, he should be considered an exempt employee.

### 1.  Evidence proffered or undisputed by the plaintiff

#### a) Pay and Employment Status

Plaintiff testified that when he was first hired by Imperial he was paid an hourly wage and received time and a half pay for his hours worked in excess of 40 hours per week (his "overtime pay"), but that in October 2003 he began receiving a "flat weekly amount" of $800 per week for his 60 hours of scheduled work per week, without overtime pay.[4]  Mota Aff. ¶ 53. Mota's pay increased over the course of his employment, but this pay structure remained in place until Mota's employment was terminated in August 2007.  Mota Aff. ¶¶ 63-64, 66-67, 70-72.

It is also undisputed that plaintiff signed an "Acknowledgment of Ineligibility For Overtime Wages," dated February 5, 2004, after Imperial became aware of Mota's participation in a class action litigation against his previous employer.[5]  TT1 26-28; TT1 182; Affidavit of Betty Rotoli

---

[4] Although in Mota's Affidavit he states that he did not receive overtime pay at the time he was paid hourly, Mota Aff. ¶ 51, he later admitted that he had received overtime payment while being an hourly employee, TT1 180:12-18.
[5] The Acknowledgement is signed by Oscar Mota and reads:

("Rotoli Aff."), Exh. C.  Plaintiff does not contest that he signed the agreement, but alleges that he was forced to sign it or risk losing his job.  Mota also acknowledges that he did not complain regarding his lack of overtime pay over the course of the nearly four year period of his subsequent employment.  TT1 173:4-9.

### b)  Job title and relative responsibility

While "job title alone is insufficient to establish the exempt status of an employee," 29 C.F.R. § 541.2, there are so many references to plaintiff as a supervisor in plaintiff's own testimony, as well as in the documents he submitted in conjunction with his direct testimony, that it is impossible not to contrast these references with the total lack of any documentation referring to Mota as a "checker" prior to the commencement of this lawsuit.  Further, plaintiff's job title is significant in that plaintiff did not dispute that the other two individuals who were called "supervisors" held management authority.  TT1 15:15-16:7.

---

I acknowledge and agree that I am an executive and administrative employee of Imperial Parking Systems and, as such, I am neither eligible for nor entitled, whether under the Fair Labor Standards Act, any wage order promulgated by the New York State Department of Labor and the Division of Labor Standards, or any federal, state, municipal or local statute, law regulation, rule, code or ordinance, to any premium wage or additional compensation or remuneration of any type for overtime work, work performed beyond my normal work schedule or work performed beyond any specified work periods.
Rotoli Aff. Exh. C.

We find that defendant's job title was that of supervisor, and that he was treated similarly to other supervisors at Imperial who were concededly exempt employees.   In making this finding, we look first to plaintiff's own admissions as to his title and relative degree of responsibility at Imperial.   There is no dispute that plaintiff listed "supervisor/general manager" on his application to work at Imperial.[6]   Further, plaintiff agreed that he shared several points of comparison with Etienne and Marzouka, including that he: (1) received a similar salary; (2) was similarly given a company car; (3) was listed on the same work schedule as the other supervisors; (4) attended meetings that included only the supervisors and officers of Imperial; and (5) was offered a commission bonus at the same time and on the same terms as the other supervisors.[7]   Plaintiff even acknowledged covering the garages of the other supervisors when one was fired or the other was on vacation.   TT1 105. While Mota insists that he had much less authority than the

---

[6]   Mota testified that he had done so, and that his prior job at ParkRight Corp. had been as a general manager.   Plaintiff described his duties at ParkRight as including:   having to "go to the garage supervisors and inspect the places, go to the offices and report to my officials, check the cars, check maintenance, check the monthly list to make sure the revenue was in, and any information about the cars, any past due payments, the painting, how the place looks, the sidewalks, the lifts, if there is any signs needed or broken."   TT1 9:13-19.   Plaintiff testified that, because he was by himself, he was given the title of general manager.   Id.

[7]   See TT1 183:5-10 (salary); TT1 36:4 (plaintiff acknowledging car); TT1 17:3-20 (meetings); TT1 157-158 (commission bonus offer).   Defendants also offered testimony that Mota (1) was provided with a company cell phone and an expense account; (2) did not have to wear the Imperial uniform worn by parking attendants and managers; and (3) received a Christmas bonus that was similarly structured to those of the other managers.   TT2 290:14-15 (cell, account); TT2 301:25-303:14 (Christmas bonuses).

other supervisors, he does not present a plausible theory as to why that would be the case, given the above similarities.

Our finding is also consistent with the numerous documents in evidence that refer to Mota as a "supervisor." In addition to his acknowledged employment application for the position of "supervisor/general manager," his work schedule is listed on a document entitled "Supervisor Schedule," and he is listed on the garage telephone list as the point of contact for 26 garages, which is approximately the same number as the other supervisors, Mota Aff. Exh. A.[8]

Further, defendants submitted and plaintiff acknowledged writing two letters to defendants in which Mota called himself a supervisor. The first was submitted as a part of one of plaintiff's notebooks and is dated May 3, 2005 and requests a raise because his duties had doubled since his beginning work as a supervisor at Imperial. Mota Aff. Exh. F. Mota testified that he may have been doing the job of supervising without being a supervisor, but it is the duties actually performed that are relevant to this analysis. TT1 104:17-105:5. In the second letter, dated August 30, 2006, Mota (1) described himself as a supervisor, (2) specifically stated that he was doing the same work as Etienne and Marzouka, and (3) requested a raise. Rotoli

---

[8] The fact that several of Imperial's garages have non-supervisor contacts listed on the telephone list does not obviate the significance of Mota's inclusion on the list for the 26 garages as a comparison point with the other supervisors.

Aff. Exh. F; TT1 104-05.  On the stand, plaintiff explained his intention in writing the letter, stating that he "was asking a raise as a supervisor."  TT1 105:22.

Again, there is no document describing Mota as a "checker" or distinguishing him from the other supervisors prior to the commencement of this lawsuit.

### c)  Recommendations to management

Plaintiff clearly made numerous recommendations to management on matters important to the operation of the business, many of which were followed.  While Mota maintains that he had no authority to hire and fire or discipline employees, he has acknowledged that his advice about employee performance and discipline was followed.  Specifically he acknowledged recommendations regarding whether an employee (1) should be made to either pay the cost of damage or be fired; (2) should be transferred; and (3) was generally doing his job correctly and on time; and he also testified that he reported on whether a manager was "doing good" and whether certain employees warranted a raise.[9]

---

[9] See TT1 129:6-11 (pay or be fired); TT1 137:8-138:8 (transfers); TT1 61:17-25 (general feedback and lateness); TT1 122 (manager feedback).  Plaintiff's notebooks and employee notices also included a number of notations regarding such activities.  See TT1 40:13-14 (reporting failure to wear uniform); TT1 80:17-24 (reporting failure to clean premises, collect money, general rudeness and lateness); TT1 93-95 (citing employee for "terrible job"); TT1 98 (recommending transfer for poor attitude); TT1 113:25-114:4 (recommending salary increase for certain employees based on performance).

It is also undisputed that Mota regularly wrote and signed employee warning, transfer, and termination notices, many of which were submitted into evidence by defendants. Plaintiff acknowledges writing and signing these forms, but claims that he was merely taking dictation as to the contents of the notices from either DeLuise or William Lerner. Other documentary evidence of his authority includes several of Mota's notebooks where he kept a log of his daily activities. There are repeated references to employment actions in those notebooks, but plaintiff again insists that any such action was taken at the explicit direction of DeLuise or Lerner. As discussed below, we find Mota's assertion that all employment actions were strictly dictated to him completely implausible.

Further, Mota has never disputed that his suggestions about financial issues and pricing relative to the competition were followed. See e.g., Mota Aff. ¶ 141. Indeed, Mota has made much over the course of this litigation of his various revenue-raising recommendations, specifically that he (1) "went around looking at prices, comparing the prices, giving specials to get more income and revenue from new monthlies, transients;" (2) "put out fliers;" (3) recommended to defendants that they "raise the parking lot to 30 cars;" (4) raise "late fees" and "SUVs;" and (5) increase "the garages' rates a little bit more, not to affect to the point that they go to another place" in an effort

to "be compatible; I mean, close to the pay range."   TT1 161:12-162:1; see also TT1 146 (suggestions that rates need to be changed); TT1 125:6-12 (discussing revenue raising measures). Mota also acknowledges that he was making these recommendations prior to any offer of a commission.   TT1 125:13-126:6.   We do not doubt that increasing profits was essential to the functioning of the company, and Mota's own testimony demonstrates his discretion to formulate and recommend changes in company policy in this regard.

While Mota's acknowledgements may not be commensurate with the full authority described in testimony offered by defendants, it certainly amounts to a showing that defendants gave Mota's opinions on important matters, including personnel, rate-setting, and marketing, "particular weight," and that Mota exercised discretion as to matters of significance.[10]

## 2.  Inconsistencies

The above findings are also informed by the rampant inconsistencies within plaintiff's depiction of his

---

[10] We further emphasize that plaintiff's argument that he is not an exempt employee rests on his assertion that he was employed as a "checker" and that such a checker would not be an exempt employee does not refute defendants' proof regarding the nature of his responsibility.  As set out above, over the course of his testimony, Mota stated that a part of the checker's job was monitoring employee performance and making recommendations regarding increasing revenue.   TT1 108:20-109:6 (employee performance); TT1 126:2-7 (making recommendations to increase revenue as associated with checker duties).   Thus Mota's insistence that he was not a supervisor, but rather a "checker" does not warrant a different result given his description of his activities.

responsibilities at Imperial.   Mota's live testimony was not only internally inconsistent, but was also often inconsistent with his direct testimony by affidavit.

Plaintiff has maintained throughout the litigation that he was a "checker," assigned to report on the garages.   However, his testimony regarding the scope of the "checker" position changed between his affidavit testimony and cross-examination, as well as over the course of his testimony on cross, both as to the number of garages for which he was responsible and the nature of his duties.

Plaintiff's direct testimony was that he was assigned to report on the conditions of 26 garages.   Mota Aff. ¶ 19. However, on cross plaintiff then stated, for the first time, that the 26 garages were only assigned for purposes of earning the commission and insisted that he was actually responsible for checking all 90-100 garages run by Imperial.[11]   Nowhere in plaintiff's affidavit or any other testimony heard at trial is such an assertion made or supported.

As to the nature of his responsibilities, plaintiff's affidavit stated that 75% of his time was spent checking the print-out from the TicketTech machine listing the cars in the lot against the cars actually parked in a given lot to identify

---

[11] See TT1 24-25 (assigned to 26 garages, but responsible for inspecting the lots of the other supervisors as well); TT1 26:17-27:2 (assigned to physically inspect all 90-100 garages).

tracking and billing errors, Mota Aff. ¶¶ 93-97, and that only 10% of his time was spent checking the physical condition of the lots, Mota Aff ¶ 98.  On the stand, plaintiff first stated that he had to:

> Inspect the garage for painting, if he finds painting on the walls, the lifts are leaking.  If the employees are giving proper tickets to the cars, for me to go take it up with a report... Check the monthly lease, to match the cars on the list.  Any broken pavement, any broken light bulbs.  If employees wear proper – they have their uniform on as the policy that Imperial requires.

TT1 10:19-11:2.  Later, he agreed that his "only duties were to report on the conditions of the lots under [his] supervision." TT1 35:6-9.  Later he added that he checked "the employees, how they moving the cars, how the cars are parked, if they there or not" and stated that he was responsible for checking the time system on the computer to see if employees arrived in an effort to determine whether employees should be paid for the day.  TT1 60:25-62:9.  Plaintiff also admitted that he was responsible for calling outside mechanical contractors when there was a problem, checking to make sure that payroll was correct, and serving as the contact person for customers in setting up monthly contracts.[12]  While these subsequently-described duties are all very different from those described initially by Mota on the stand, we also note that all of these duties are outside of what

---

[12]  See TT1 102:20-22 (discussing elevator repair contractor); TT1 146 (payroll); TT1 146 (monthlies).

plaintiff's affidavit stated he spent three-quarters of his time doing: namely checking the printed ticket against the cars in the lot and identifying discrepancies.[13]

There are also inconsistencies between written documents created by Mota during his time at Imperial and his testimony on the stand at trial. First, in his letter to the defendants on August 30, 2006 requesting a raise, Mota stated that he had the same duties as Etienne and Marzouka. Rotoli Aff. Exh. F. When confronted with this letter on the stand, however, Mota denied having similar duties, indicating that he wrote the letter for the purpose of obtaining a raise and that it wasn't a true statement. TT1 148-149. Second, plaintiff's own notebooks refer to the training of a new supervisor, but plaintiff insisted on the stand that he was merely showing the new supervisor around.[14] TT1 142.

Finally, plaintiff's testimony on the stand was not internally consistent. In addition to the examples cited above, Mota went back and forth on whether he was only supposed to file a report at the end of the day or rather required to call the

---

[13] Less significantly, Mota was also inconsistent regarding the time he spent traveling between locations, with his affidavit stating that he spent 5% of his time in transit, while he testified on the stand to spending 10-15% of his time between garages. TT1 188:4.

[14] The notation in Mota's notebook reads: "As Bobby requests, check on new supervisor to be hired. Train him. Met at 2 p.m." TT142:13-15; Mota Aff. Exh. I.

office and seek instruction.[15]   Also, when confronted with the
April letter, Mota insisted that he had "never seen this
document before," reaffirmed this insistence after the Court
clarified that this would include even for purposes of
litigation, but then changed his answer after his lawyer asked
him the same question again.   TT1 200-01. Responding to signals
from his lawyer in this way does not buttress plaintiff's
credibility in the eyes of the Court.

While all of this is sufficient to draw the plaintiff's
credibility into doubt, we note that the inconsistencies are not
limited to the plaintiff's own testimony, but rather extend to
his entire case.   While Mota widened his range of duties beyond
the primary activities included in his affidavit, plaintiff's
other witnesses did not.   Mr. Almonte, a former garage manager
at Imperial who testified for the plaintiff, described Mota's
duties as only to check the cars against the printed ticket and
then to ask Almonte about any missed cars.   TT1 210:17-23.   When
Mr. Almonte was asked whether Mota would observe the location
itself, for example for leaks or lights out, Almonte responded,
"No, that was my responsibility."   TT1 212:19.   Another former

---

[15] For example, within the same exchange regarding what he would do when faced
with a car that was not parked straight, plaintiff first stated that he would
"only have to send a report in" then testified that he would have to "call
the office."   TT1 63:17 (report); TT1 66:11 (call).   As discussed below, the
ridiculous but consistent assertion in this exchange was that Mota would
under no circumstances either inquire of the garage manager or attendant as
to whether the car should instead be parked correctly or take any action with
regard to the employee without consulting DeLuise or Lerner first.

Imperial garage manager called by the plaintiff, Angel Orta, stated that Mota was responsible for checking the printed ticket and for damage in the garage.   TT2 225:25-226:1.   While he called Mota a "checker," he also stated that when there was a maintenance problem he would "always report to one of my superiors," meaning Mota.   TT2 230:1-8.

### 3.  Implausibility

In addition to these findings, we take into account the implausibility of Mota's testimony as to his limited authority, which stands in stark contrast to the defendants' evidence regarding his job duties.   Defendants proffered numerous employee warning and termination notices, which plaintiff acknowledged writing and signing.   Despite this acknowledgement, however, Mota insisted that he had no discretion in writing the notices and that they were strictly dictated to him by either Defendant DeLuise or Defendant William Lerner.   TT1 35:6-9; TT1 33:15-34:19.

First, we find Mota's description of the required dictation method generally implausible.   As implied by the emphasis in the Code of Federal Regulations' treatment of the executive exemption on the employee's role in influencing personnel decisions, such decisions are for good reason generally reserved to those in a supervisory role.   It would thus certainly be odd for Imperial management to decide that an employee whose sole

21

duty is to report on the condition of the lots should also act as a middle man responsible for writing and distributing employment action notices. Further, the dictation process depicted by Mota was irrational as it would have created more work for his superiors than an initial write-up by Mota himself.[16]

Second, several portions of plaintiff's testimony regarding personnel actions were very specific but similarly incredible: (a) plaintiff's description of what was required of him upon being confronted with cars that were not parked straight and a sleeping worker were absurd;[17] (b) though Mota acknowledged writing an employee a warning notice when an employee was found to be storing a "big sofa" at the garage, he insisted that he had no personal knowledge of the basis for the warning, i.e. of the "big sofa's" presence in the garage, despite his alleged duty to physical inspect the garage;[18] and (c)   Mota insisted that he could tell which of Lerner or DeLuise had dictated a

---

[16]   This number of employees about whom Mota might have reported is not clear from the testimony, but it is no doubt a substantial number given Mota's assertion that he was assigned 26 garages but actually responsible for reporting on all 90-100 garages, many of which had at least one or potentially many more employees working multiple shifts.

[17]   His assertion that, rather than simply telling the attendant to park the car straight or waking up the sleeping worker,  he would have to file a report or speak with a supervisor and take no other action, is completely implausible.  Presumably, the reason to park a car straight is to avoid a collision with an adjacent car when the angled car is moved.  Further, Mota's testimony that he would watch a sleeping attendant from 3 a.m. to 6 a.m. when he could call a superior, rather than simply wake the attendant, is obviously contrived.   See TT1 63:6-64:21 (parked straight); TT1 45-49 (sleeping worker).

[18]   See TT1 37:24-38:13; TT1 55; TT1 57.

given notice dating to five to ten years ago "because of the statement is on the document."[19]

Adding to the implausibility of plaintiff's depiction of his duties is the fact that he was aware of the overtime laws and of the requirements regarding overtime pay while working at Imperial.   As established on cross-examination, Mota received notice of and joined a class action suit against his former employer soon after starting at Imperial.   Mota also acknowledged that he understood that he was receiving his salary for the 60 hours of work per week that he was assigned, and that he was to stop receiving overtime pay when he was shifted to a salary in October 2003.   This knowledge, coupled with the fact that Mota signed the Acknowledgment and did not raise an overtime issue with respect to those 20 hours at any time during his nearly four years of employment on a salary basis, makes his assertion now that he was in fact owed overtime pay dubious at best.   See TT1 173:4-10.

### 4. Defendant's evidence

The implausibility of Mota's testimony is contrasted by the credible evidence submitted by defendants that supports Mota's exempt status.

---

[19]   TT1 41.   We note that despite questioning in this regard, Mota was unable to provide any articulated basis for the distinction aside from the quotation above.

Defendant William Lerner testified to Imperial's managerial structure and Mota's place as one of three supervisors, reporting to the General Manager and holding full authority to manage the day-to-day activities and personnel decisions at his 26 assigned garages.  Supervisor Alex Etienne supported this description, describing his own authority to hire and fire without permission from his superiors, and testified that Mota had similar authority.   Defendant DeLuise supported this testimony as well.  Both Lerner and DeLuise testified that they did not dictate the contents of the employment action notices to Mota, and that it would have been totally infeasible to do so. We credit all of this testimony and find that Mota had at the very least significant input into employment decisions, and likely had discretion to make these decisions on his own.  The voluminous documentary support pointed to by defendants in carrying their burden has been chronicled above and need not be repeated here.    Regardless of his precise level of authorization, Mota falls within the exemption from overtime pay.

\*     \*     \*

In sum, based on (1) Mota's own statements regarding his pay structure, job duties, and relative responsibilities; (2) his inconsistencies in describing his duties; and (3) the implausibility of his depiction of his lack of authority,

24

especially in comparison to the credible evidence submitted by defendants; we find that Mota was an exempt employee under the labor laws and thus was not entitled to overtime wages for hours worked in excess of 40 hours per week.

### C.  Deductions

As discussed above, the regulations promulgated under the authority of the FLSA require that an employee be paid on a salary basis.   This in turn requires that such pay not be subject to deductions based on the "quantity and quality of the work performed."   29 C.F.R. §541.602(a).   Plaintiff here has argued that he was subject to impermissible deductions from his pay, and thus should be classified as non-exempt.

However, deductions only affect an employee's otherwise exempt status if "there is either [1] an actual practice of making such deductions or [2] an employment policy that creates a 'significant likelihood' of such deductions." Coleman-Edwards v. Simpson, 330 Fed. App'x 218, 220 (2d Cir. 2009)(Summary Order)(citing Auer v. Robbins, 519 U.S. 452, 455, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)); see also 29 C.F.R. §541.603(a).   A single punitive pay deduction for missed work is not sufficient to demonstrate such a practice or policy, and "a deduction of one or more full days in response to an employee's absence for personal reasons will not affect his or her status as an exempt

employee." _Coleman-Edwards_, 330 Fed. App'x at 220 (citing 29 C.F.R. §541.602(b)(1)). A "policy" of deduction-taking requires that employees "be able to 'point to [a] rule that states[s] that if they commit[] a specific infraction, their pay [will] be docked.'" _Kelly v. City of Mount Vernon_, 162 F.3d 765, 768 (2d Cir. 1998)(quoting _Ahern v. County of Nassau_, 118 F.3d 118, 122 (2d Cir. 1997)).

Aside from broad allegations in his affidavit that Imperial took deductions from his paycheck,[20] Mota testified to only two other categories of deductions: (1) deductions "from my days out, I was out, stuff like that," TT1 169:24; and (2) one specific deduction of $280, which occurred within a month of his hiring at Imperial, and of which Mota acknowledges, "I don't have no evidence of that." TT1 170:5-7, _see also_ TT1 205:11-12; Mota Aff. ¶¶ 127-128 (explaining $280 deduction further).

The only general practice of deductions alleged is for days missed for unexplained absences,[21] which, as set out above, does not come within the definition of improper deductions for the purposes of this analysis. Moreover, Rotoli testified from her knowledge of the payroll for Imperial that the only regular deductions taken from plaintiff's paycheck were for union dues and garnishments for child support. TT2 369:21-23. With

---

[20] _See_ Mota Aff. ¶¶ 122-128.
[21] Defense witness Rotoli also acknowledged that when an employee missed a full day's work without explanation, he would not be paid for that day of work. _See_ TT2 369-70.

respect to the $280 deduction, even according to plaintiff's own testimony, it was taken at the time when he was being paid hourly and receiving payments for overtime.   TT1 180:15-23 (originally paid hourly and received overtime, then switched to salary in October 2003).   Thus Mota has failed to establish either an actual practice of deductions or any semblance of a policy of taking improper deductions, and accordingly, there is no evidence of any intention on the part of defendants not to pay Mota on a salary basis.[22]   Accordingly, Mota's exempt status will remain intact.

## II.   Whether Mota is entitled to a commission based on profits at his assigned garages

The collection of claims raised here relate to an alleged promise to pay a commission, though on what terms and for what period the parties disagree.   Mota maintains that the commission promise was based on a written letter, dated March 1, 2004, which stated:

> To Oscar Mota
> This certifies that you will receive 1% commission of [sic] the profits made from all your assign [sic] garages at the end of each year. My proposition is

---

[22] We note that Mota testified that he was forced to sign the Acknowledgement for fear of being fired.   Mota Aff. ¶¶ 55-56.   However, we do not see how such an assertion would negate his understanding that the defendants intended to treat him as a salaried, exempt employee, which is all the document sought to convey.   We do not base our finding of Mota's exempt status on this document, but we note its consistency with the other indicators of Imperial's intent regarding Mota's exempt status.

```
        [sic] to increase revenue in each garage. Please be
        guided accordingly.
        [Scrawl]
        William Lerner
        President
```

Affidavit of Oscar Mota ("Mota Aff.") Exh. J. The letter
appears on Imperial letterhead and includes a scrawled
signature, allegedly by Lerner. Lerner testified that he did
not write or sign the letter and insists that it is a forgery.
Affidavit of William Lerner ("Lerner Aff.") ¶ 7.

Instead, defendants offer another memorandum, dated April
29, 2004, which they present as the only offer of a commission
that was ever made. It is addressed to Alex Etienne, Anthony
Marzouka, and Oscar Mota and is unsigned but lists William
Lerner in the "From:" heading. The memorandum is not on
letterhead.[23] This letter states:

> This is to reiterate what we talked about yesterday.
> For every dollar that you raise in any of your garages
> on an annual basis I will give you 1% as a bonus at
> the end of the year. E.g. if you increase the bottom
> line in each of your garages by $1,000 per month X 12
> months = $12,000 X 18 locations = $216,000 X 1% =
> $2,160.00. I want you to put this memo in your pocket
> so you know that you have a guarantee from me at the
> end of December 2004. In addition, the supervisor
> whose garages have increased the most percentage wise
> over 2003 will get a very **LARGE** bonus from the
> company. This way the three of you can have a fun

---

[23] Defendants' witness Betty Rotoli testified that she transcribed Lerner's
letter, as dictated by him, and distributed it to Etienne, Marzouka, and
Mota. She also testified that she had never seen the March letter prior to
the commencement of this litigation. She further stated that it was normal
practice to use letterhead for letters unless they were internal memos, in
which case they were not typed on letterhead and did not include a signature.
TT2 355-356.

> competition to see who is the most effective
> supervisor in the company. There is nothing arbitrary
> about this competition where I can say I do not like
> how the place looked or I do not like the men you have
> in the garages. It comes down to dollars and cents.
> Good luck and may the best man win.

Affidavit of William Lerner ("Lerner Aff.") Exh. A. Defendants'

memorandum is more limited than plaintiff's in two respects: (1)

the percentage offered is of only the increase in the profits;

and (2) the offer is limited to the year 2004. It is undisputed

that no commission or bonus was ever paid to Mota, Etienne, or

Marzouka under the terms of either.

In the alternative to his breach of contract claim,

plaintiff makes several other arguments based on the terms set

out in the March letter.

### A.  Breach of Contract claim

To prevail on a breach of contract claim under New York

law, a plaintiff must prove the following elements: (1) a

contract, (2) performance of the contract by one party, (3)

breach by the other party, and (4) damages. See Terwilliger v.

Terwilliger, 206 F.3d 240, 245-46 (2d Cir. 2000)(citations

omitted); Saffire Corp. v. Newkidco, LLC, 286 F.Supp.2d 302, 306

(S.D.N.Y. 2003)(citation omitted). Defendants contend that the

document submitted by Mota as the basis of his contract claim,

the March letter, was not written by defendant Lerner and bears
a forged signature, rendering it unenforceable.  We agree.

"Under [New York] State law and general contract law, a
forged signature renders a contract void ab initio. Because
there can be no meeting of the minds of the parties when a
forgery has been perpetrated, no contract existed in the case at
hand." Opals on Ice Lingerie v. Bodylines Inc., 320 F.3d 362,
370 (2d Cir. 2003)(quoting Orlosky v. Empire Sec. Sys., 230
A.D.2d 401, 403, 657 N.Y.S.2d 840, 842 (3rd Dep't 1997)(internal
quotation marks removed).

Defendant does not bear the burden of proof that the
document is a forgery.  Rather, "the burden is placed on the
proponent of the evidence to authenticate the evidence it seeks
to have admitted and to establish its credibility with the trier
of fact." D&N Property Management & Development Corp., Inc. v.
Copeland Companies, 56 Fed. App'x  545, 546 (2d Cir. 2003)
(Summary Order) (citing Fed. R. Evid. 901; United States v.
Almonte, 956 F.2d 27, 29-30 (2d Cir. 1992) (per curiam)).  As
discussed below, defendants have submitted testimony drawing the
authenticity of the March 1, 2004 letter into doubt, and
plaintiff has offered no proof that the March letter was in fact

authentic aside from Mota's testimony, which as discussed above, we find to be lacking in credibility.[24]

### 1. The March 1, 2004 letter is a forgery

First, we note the evidence submitted by defendants regarding the March letter.  Lerner testified that did not write the March letter, nor had he ever seen it before this litigation, and as discussed above, introduced the April letter as evidence of a different offer.  Lerner Aff. ¶ 7.  Rotoli, who generally types Lerner's letters as he dictates them, testified that she did not type the March letter, nor had she ever seen it before.  In contrast, she testified that she had typed and distributed Lerner's April letter.  TT2 355-357.  Supervisor Alex Etienne testified that he had not received a letter similar to the March letter, but that he had received a copy of the April letter.  TT2 475-480.

Second, we find that the suggestion that Lerner would offer Mota not just one percent of the increase in profits at his assigned garages, but rather one percent of all profits at the garages he supervised, mere months after he was hired and for an indefinite period into the future, completely implausible.

Third, we find that the grammatical errors in the March letter support the finding that it is a forgery.[25]  Plaintiff

---

[24] We note that our finding that the letter was a forgery undermines the plaintiff's credibility even further.  See Clauson v. Eslinger, 455 F.Supp.2d 256, 260 (S.D.N.Y. 2006)(finding plaintiff forged defendant's name on an agreement and that such forgery undermined the plaintiff's credibility).

31

argued that the fact that the March letter appears to be on company letterhead supports its authenticity; however, this was amply refuted.   Initially, we note that the only March letter in evidence is a copy, not an original.   Apart from best evidence and authenticity issues, there is no reason to assume that Mota did not have access to company letterhead.

Also, defendants offered into evidence another document appearing to be on company letterhead that also appears to be a forgery.[26]   We find that the signature on this second document bears a striking resemblance to that of Mota on the numerous

---

[25]   The grammar errors include the substitution of "of" for "on," the omission of the suffix on "assign," and the phrase "my proposition is to increase revenue."   Mota Aff. Exh. J.

[26]   Defendants submitted a letter, dated April 24, 2006, that is addressed to the Union Local 272 and includes the following text:

> This letter is to verify that Oscar Mota is employed in our firm since may [sic] 2003 as a field supervisor and his position was considered permanent.   He has been a moderate employee and his salary was $2030.00 bi-weekly calculated on 134 hrs bi-weekly including overtime pay.   Due to financial changes in our firm and lack of work we have changed the above employee to parking attendant effective Sat 04/29/2006 and his pay has changed to fix [sic] salary rate of $1015.00 bi weekly [sic] calculated on 80 hrs bi-weekly basis.   This decision considers [sic] the 5 day notice and seniority agreement as per Union Local 272.   Any question do not hesitate to call [sic]
> Sincerelly [sic]
> [Signature]
> Manuel Bautista
> Human resources Adm. [sic]
> 650 Parking Corp.

Defendant's Exh. S.   The letter is signed and appears to be on Imperial letterhead.   However, Rotoli testified that 1) she saw the letter for the first time in the process of reviewing documents produced by Mota in conjunction with this litigation; 2) Bautista was a garage manager at 345 East Garage Corp, never had the title of Human Resources Administrator nor had any affiliation with 650 Parking Corp., and did not have the authority to write such a letter nor any access to letterhead in the garage; and 3) the signature "does not look like his signature," based on her comparison with the endorsed payroll checks in his personnel file, which were also submitted into evidence.   TT2 375-379. We agree that the large, sprawling Bautista signature on the letter is strikingly different than the uniformly small, neat signature on the paychecks. See Defendants' Exh. T.

32

employment action forms submitted in evidence. Further, it bears no resemblance at all to other examples produced in Court of the alleged signer's signature and as testified to by Rotoli. Rotoli Aff. Exh. B; TT2 375-379; Defendants' Exhs. S, T.

### 2. The evidence supports defendants' letter as the only offer ever made

We find that the evidence supports the conclusion that the April letter represents the only commission terms offered by the defendants. Mota has acknowledged that he attended a meeting with the other two supervisors where they learned of the defendants' offer, though he maintains that the meeting was in March and that his version of the letter is the correct one.[27] Especially in light of the credibility finding above, this assertion falls in the face of testimony from defendants' witness Rotoli that she typed the April letter and gave it to all three supervisors at Lerner's direction following a meeting where the offer was discussed, as well as Etienne's acknowledgment that he attended that meeting and received the letter. TT2 469:21-25 (meeting); TT2 477:22 (letter). Further, Mota's understanding of what he was entitled to – either the percentage of the full profits as argued in plaintiff's submissions to the Court or the percentage of the

---

[27] See TT1 157-158 (discussing meeting where offer was made); TT1 200:17-201:3 (refusing to acknowledge having seen Lerner's April letter).

increase, as described in the April letter – is variable.   See TT1 164-67 (discussion of profit calculations).[28]

We also find the offer of one percent of the increase in profits for the one year period in the April letter to be a much more plausible bonus structure than the much broader suggestion of Mota. [29]

### 3. Because plaintiff's proffered contract is a forgery, there is no enforceable contract to form the basis of plaintiff's breach of contract claim.

These facts leave us with the conclusion that the March 1, 2004 letter is a forgery, and thus void ab initio and unenforceable.   The only evidence of an offer by defendants regarding a commission payment is that memorialized in the April letter, which is on different terms than that offered by plaintiffs.   Since Mota has continued to deny the April offer, there was no meeting of the minds between Mota and defendants regarding the commission payments and no contract was formed.

---

[28] Mota first insisted that he was entitled to one percent of total profits, but when given a mathematical hypothetical by the Court, answered that he would have expected to be given one percent of the increase in profits.   TT1 164:17-168:9.

[29] Defendants have admitted that they have never paid any such commission, but have stipulated that Mota's commission would amount to $23.26.   TT2 255.   We have no other evidence of what the payment owed might be, and no evidence that it is anything other than such a de minimus amount.   Indeed plaintiff's only testimony regarding how much he might be owed is that he thought he was successful in boosting profits because the garages seemed "pretty full."   TT1 162.   He also stated that his sense of what he was owed came from his inner perception of what was due him as fair compensation.   TT1 163/14-15 ("Inner me. Just me, how I figured things out.").   No effort was made by Mota's counsel to use financial records to ascertain a more precise and supported analysis.

This result also leads us to find for defendants on plaintiff's implied contract and labor law claim regarding commissions owed.[30]   Any argument that the parties reached an agreement with respect to the terms of the commission payments is refuted by the analysis above.

### B.   Plaintiff's alternative arguments regarding the commission payment do not allow for recovery.

Plaintiff makes several arguments in the alternative to his breach of contract claim regarding his entitlement to a commission payment.[31]   However, plaintiff has maintained throughout this litigation that the March letter memorializes the only commission promise made by Imperial.   Because of plaintiff's repeated insistence that this document is the

---

[30] "Wages, within the meaning of the New York Labor Law, do not include bonuses, profit-sharing, or other forms of incentive compensation unless the incentive compensation is already earned by the employee." Broyles v. J.P. Morgan Chase & Co., No. 08 Civ. 3391 (WHP), 2010 WL 815123, at *4 (S.D.N.Y. Mar. 8, 2010)(citing Truelove v. Northeast Capital & Advisory, Inc., 738 N.E.2d 770, 771-72, 95 N.Y.2d 220 (N.Y. 2000); Dean Witter Reynolds, Inc. v. Ross, 429 N.Y.S.2d 653, 658, 75 A.D.2d 373, (1st Dep't 1980)).   "An employee's incentive compensation is 'earned' when the employee acquires a vested interest in the award and its payment is not conditioned [ ] on some occurrence or [otherwise] left to the discretion of the employer.   Bonuses and similar incentive compensation generally become vested by contract or by the awarding of a specified amount." Id.   (quoting Aledia v. HSH Nordbank AG, No. 08 Civ. 4342(BSJ), 2009 WL 855951, at *3 (S.D.N.Y. Mar. 25, 2009)).   Because we have found that no binding contract exists and no commission was ever paid to plaintiff, there can be no vested interest in the payment.

[31] We note that regardless of whether plaintiff can pursue any alternative theory and regardless of the merit of any of these claims, we find that the maximum recoverable amount of damages in this action would be $23.26 plus any interest that has accrued.   This amount was stipulated to by the defendants as the amount that would have been due under the defendants' proffered agreement.   Though plaintiff cross-examined defendant William Lerner regarding copies of his tax returns, no evidence was entered that would indicate that the amount actually owed to Mota under the terms of this agreement is anything other than such a de minimus amount.

embodiment of the agreement,[32] he is not permitted to recover on his alternative theories when we have found that this document is in fact a forgery.[33]   Accordingly, there is no factual predicate for claims based on any such promise, including plaintiff's claims for detrimental reliance, promissory estoppel, fraudulent inducement, and negligent misrepresentation.[34]   Additionally, plaintiff was paid his full salary through the time of his termination, so there can be no claim of unjust enrichment or quantum meruit because he was fully paid for the performance of his services.[35]

---

[32] Plaintiff's most recent affirmation of its reliance on the March letter came at Closing Arguments.  There, the Court asked "[Are you] arguing that the document that Mr. Mota relied on is genuine and that it entitled him to one percent of the profits of the garages to which he was assigned?" Plaintiff's counsel replied, "Yes, your Honor."  Closing Argument Transcript ("CAT") 10:5-9, July 15, 2010.

[33] We note that plaintiff's prosecution of this suit based on a forged document could warrant sanctions.  See Fed. R. Civ. P. 11 (requiring that every pleading, motion, and other paper of a party represented by an attorney be signed by at least one attorney and that such pleading or paper be "well grounded in fact"); see also Pope v. Federal Exp. Corp., 974 F.2d 982, 984 (8th Cir. 1992)(approving of the sanction of dismissal "based on the district court's finding that manufactured evidence and perjured testimony had been introduced in an attempt to enhance the case through fraudulent conduct").

[34] We also note that plaintiff's negligent misrepresentation claim further fails because "under New York law, a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty." Muller-Paisner v. TIAA, 289 Fed. App'x 461, 465 (2d Cir. 2008)(citations omitted).   "[C]ourts have routinely held that the employer-employee relationship does not constitute a special relationship sufficient to support a claim for negligent misrepresentation."  Kwon v. Yun, 606 F.Supp.2d 344, 356-57 (S.D.N.Y. 2009) (citing and describing cases); see also Madera v. Metropolitan Life Ins. Co., 99 Civ. 4005 (MBM), 2002 U.S. Dist. LEXIS 12000, at *24-25 (S.D.N.Y. Jul. 2, 2002) (dismissal of negligent misrepresentation claim where corporate officer made representations concerning promotions).

[35] "In order to recover in quantum meruit under New York law, a claimant must establish '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefore, and (4) the reasonable value of the services.'" Leibowitz v. Cornell University, 584 F.3d 487, 509 (2d Cir. 2009) (quoting Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d

## CONCLUSION

For the reasons stated above, we find for defendants on all counts.

**SO ORDERED.**

Dated:     New York, New York
           August 24, 2010


                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE


**Copies of the foregoing Order have been mailed on this date to the following:**

Michael A. Faillace, Esq.
Michael Faillace & Associates, P.C.
110 East 59th Street, 32 Floor
New York, NY 10022

Douglas E. Rowe, Esq.
Certilman Balin Adler & Hyman, LLP
90 Merrick Avenue
East Meadow, NY 11554

---

168, 175 (2d Cir. 2005)). "A claimant seeking relief under a theory of unjust enrichment in New York must demonstrate '(1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.'" Id. (quoting In re Mid-Island Hosp., Inc., 276 F.3d 123, 129 (2d Cir. 2002)). These claims can be analyzed together as a single quasi-contract claim. See Zikakis v. Staubach Retail Services, Inc., No. 04 Civ. 9609 (NRB), 2005 WL 2347852, at *5 (S.D.N.Y. Sept. 26, 2005) (citations omitted). In addition to the above finding, we do not hesitate to find that equity and good conscience in no way entitle plaintiff to relief here.